UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LEWIS CAIRNS, et al., | ) | CASE NO. 4:17-cv2215 |
| | ) | |
| PLAINTIFFS, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | **MEMORANDUM OPINION** |
| | ) | |
| PHILLIP MALVASI, et al., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion for summary judgment filed by defendants. (Doc. No. 28 ["MSJ"].)[1] Plaintiffs filed a memorandum in opposition (Doc. No. 36 ["Opp'n"][2]), and defendants filed a reply (Doc. No. 39 ["Reply"]). For the reasons set forth herein, defendants' motion is granted.

## I. BACKGROUND

On October 19, 2017, Lewis Cairns ("Cairns") and his wife Natalie Mondary, MD ("Mondary") (collectively "plaintiffs") filed a complaint under 42 U.S.C. § 1983 against Phillip Malvasi, DO ("Malvasi") and Mary Schuler ("Schuler") (collectively "defendants") alleging two claims: one against Schuler, asserting deliberate indifference to the serious medical needs of Cairns—allegedly resulting in drug withdrawal and various other injuries—while he was incarcerated at the Trumbull County Jail from November 19, 2014 to November 28, 2014, and one

---

[1] Defendants also moved for oral argument on their motion. (*See* Doc. No. 40.) As there is no need for oral argument that motion is denied.

[2] The last two pages of the appendix accompanying the opposition are completely illegible and have not been relied upon for any reason.

against Malvasi for failure to train and/or supervise Schuler. Incorporated within the first claim (against Schuler) is language that might be construed as a loss of consortium claim by Mondary.

Malvasi was, at all relevant times, the Medical Director of the Trumbull County Jail (the "jail"). (Doc. No. 34-1, Deposition of Dr. Phillip Malvasi ("Malvasi Dep.") at 478.[3]) Schuler was a registered medical assistant at the jail. (Doc. No. 25-1, First Deposition of Mary Schuler ("1 Schuler Dep.") at 181-82 (8-9).[4]) Schuler was supervised by Malvasi. (*Id.* at 182 (11).)

Cairns himself has little or no memory of the events he alleges in his complaint. (Doc. No. 23-1, Deposition of Lewis Cairns ("Cairns Dep.") at 114 (48-49); 116 (55).) He was sent to the jail on November 19, 2014 due to a parole violation, namely, testing positive for cocaine. (*Id.* at 115 (54).) This was his fourth time at the jail. (*Id.*)

When Cairns arrived at the jail on November 19, 2014, he went through the normal intake process, as evidenced by jail intake and observation forms produced by Trumbull County during discovery. (Doc. No. 28-1, MSJ Exhibit A ("Ex. A").) Cairns has no memory of the intake process on that day, but knows generally of the process from his previous incarcerations. (Cairns Dep. at 117 (62).) Cairns was observed to be behaving normally in all respects and was without signs or symptoms of any alcohol or drug influence or withdrawal. (Ex. A. at 277.) He reported being on one medication – Effexor (identified on the intake form as "Effoxin")—which he had with him when he arrived at the jail. (*Id.* at 278; Doc. No. 28-2, MSJ Exhibit B ("Ex. B") at 279.) The prescription was taken from Cairns and was reported immediately to Malvasi, who ordered that a 75 mg. dose of the drug be administered to Cairns twice daily during the regular Med Pass. (Ex.

---

[3] All page number references are to the page identification number generated by the Court's electronic docketing system.

[4] For this and any other deposition filed in a form with four pages to each sheet, the Court will first cite to the Page ID# followed by the actual page number in parentheses.

B. at 280.) It is undisputed that Cairns never told jail personnel that, for about a year, he had also been prescribed (and was taking) Xanax.[5] Cairns does not know why he failed to inform the jail about this medication during intake. (Cairns Dep. at 130 (111).)

Schuler was working the morning shift at the jail from 6:00 a.m. to 2:00 p.m. on November 25, 2014. (Doc. No. 25-2, Second Deposition of Mary Schuler ("2 Schuler Dep.") at 210.) Her only contact with Cairns occurred on that day, when she gave Cairns his prescribed Effexor at 8:00 a.m., as reflected in jail records. (1 Schuler Dep. at 191–94 (45-57); Doc. No. 28-4, MSJ Exhibit D ("Ex. D") at 282.) A narrative supplement to the medication report, which was made by Officer Matthew Abbott (not by Schuler), notes that "during Med Pass [Cairns] was paged multiply [sic] times and was very slow to the door[.]" (Doc. No. 28-5, MSJ Exhibit E ("Ex. E") at 283.) When Cairns finally appeared at his door, "he was shaking and seemed on edge." (*Id*.) Abbott reported that "medical staff (Mary)" (*i.e.*, Schuler) told him that Cairns had "missed the last few days of his medication." (*Id*.; Ex. D at 282.)[6] Cairns was given his Effexor and "returned to his bunk." (Ex. E at 283.)

As already noted, Cairns never told Schuler (or, apparently, anyone at the jail) about his Xanax prescription. Schuler testified that, had Cairns told her, she would have promptly obtained an order from Malvasi to administer that prescription to Cairns pursuant to the jail's medical policy. Schuler was familiar with withdrawal signs and had seen them many times in her work at

---

[5] Cairns' history with Xanax is described more fully in the Expert Report of Stephen Noffsinger, M.D. (*See*, Doc. No. 28-7 at 311.)

[6] Medical records show that Cairns had been a complete "no show" for Med Passes (as indicated by a circled "NS") on November 22, 23, and 24, 2014. Cairns also refused to take his Effexor on November 26 and 27, 2014 (as shown by the circled "R" on the medication form). (Ex. D at 282.) Schuler testified that, when an inmate refuses a medication or is a "no show," nothing is done because "[t]hat's his right to refuse his medications or not show up for his medications. We can't force anybody to take their medications." (1 Schuler Dep. at 192 (52).)

3

the jail. (1 Schuler Dep. at 182-84 (12–17); Doc. No. 28-6, MSJ Exhibit F ("Ex. F") at 284.) She considered withdrawal from drugs to be a "serious medical condition[,]" and "possibly . . . life threatening[.]" (*Id*. at 184 (20).)[7]

On November 25, 2014, at approximately 1350 hours (*i.e.*, 1:50 p.m.), Cairns was reportedly not responding to lock-down orders from Officer Cintron (a relatively new employee at the time). He was "acting off a little bit[]" and was "not understanding what [she was] saying." (Doc. No. 30, Deposition of Bernice Cintron ("Cintron Dep.") at 367–369.) In a jail incident report, Cintron stated that she "called over the radio for [Officer] Anders to let him know about the [sic] Cairns due to the fact he [Anders] was the rolver [sic – probably *rover*] that took him down to medical for an observation after lunch approximately 1251 [12:51 p.m.] because he was acting strangly [sic]." (Doc. No. 37-3 at 629.) During her deposition, Cintron testified that she had no idea why Cairns would have been taken to medical after lunch, as she had not requested it. (Cintron Dep. at 369–70.) When questioned about this during his deposition, Anders had no recollection of taking Cairns for any medical evaluation after lunch on that day. (Doc. No. 26-1, Deposition of James Anders ("Anders Dep.") at 231–32 (11–12).) In addition, Schuler, who would have been the medical person on duty at that time, also did not recall seeing Cairns at or around 12:51 p.m. (1 Schuler Dep. at 212.) In fact, other than the passing mention in Cintron's jail incident report of the 1251 medical observation, there is no documentation of any such medical visit.

---

[7] Malvasi testified, however, that symptoms are much the same for withdrawal from *any* drug of abuse (nausea, vomiting, abdominal pain); merely observing those symptoms would not allow the observer to pinpoint any specific drug, without being told what drug had been taken or without performing a urine drug screen test. (Malvasi Dep. at 516–17.) Drug screen tests are not routinely performed when a person is booked into jail. They are performed upon court order; even then, the test results are provided to the probation department, not to the jail's medical personnel. (*Id*. at 517.)

4

In any event, officers came to assist Cintron at around 1355 hours (*i.e.*, 1:55 p.m.). (Doc. No. 37-3 at 629.) They placed Cairns in restraints and notified medical personnel that they were taking him to the medical floor for observation. (Doc. No. 27-1, Deposition of Richard Nichols ("Nichols Dep.") at 246 (34–36) and Doc. No. 37-4 (Exhibit) at 631.)[8] Schuler's shift that day would have been just ending (at 2:00 p.m.) and, according to Nichols, the medical person he notified was Kara Lightner.[9] (*Id*. at 246 (36).)[10] Pursuant to jail policy, once Cairns was in the medical lockdown, he would have been monitored every ten minutes by the officers on duty. (*Id*. at 214 (16).)[11]

---

[8] A few days after this incident, in a narrative supplement, Officer Nichols reported that, although on November 25, 2014, he had assumed Cairns was suffering from alcohol withdrawal, someone (whom he could not remember) told him Cairns was "coming off of Xanax." (Exhibit to Nichols Dep. at 631; Nichols Dep. at 247 (36–37).) In their opposition brief, plaintiffs cite to this same paragraph of the narrative as creating "a fact in dispute." (Opp'n at 593.) Reporting on the events of November 25, 2014, Nichols stated in his narrative that "medical was again notified[.]" Plaintiffs incorrectly offer this statement as proof that "*prior to* the first reported instance on the 25th day of November, 2014 . . . Cairns had been observed by medical staff." (*Id*. at 592, emphasis added.) This is highly disingenuous since plaintiffs questioned Nichols about this "again notified" phrase during his deposition. Nichols explained that, on November 25, 2014 when Cintron called for backup due to Cairns' strange behavior, medical was notified but was not yet on the third floor when Nichols arrived, so "medical was again notified[.]" (Nichols Dep. at 246 (35–36).) In view of their own very particular questioning about this phrase, it appears that plaintiffs are now attempting to purposely blur the facts in hopes of creating the appearance of a material factual dispute.

[9] Plaintiffs assert that Nichols reported *to Schuler* that Cairns was taken to the medical floor at 1:55 p.m. (Opp'n at 590.) This is arguably possible (though not likely), since Schuler *was* on duty until 2:00 p m. and, according to Lightner, *her* shift on November 25, 2014 began at 10:00 p.m. (Lightner Dep. at 459.) It is not clear who might have been on duty between 2:00 p.m. and 10:00 p.m. For purposes of analysis, it does not seem material who precisely in the medical department would have received notice that Cairns was being moved to a medical observation cell, since there is nothing in the record to suggest that medical personnel would have been expected to go to the cell to perform any services unless called to do so by an officer.

[10] Plaintiffs also point to an email that supposedly suggests that Schuler left instructions after her shift on November 25, 2014 to "[k]eep an eye on Inmate Cairns" who "is coming off of Xanax[.]" (Opp'n at 591 (quoting Trumbull Bates Nos. 000076–77).) Although the exhibit is identified by plaintiffs as an exhibit to Schuler's deposition—and it appears it was discussed during her second deposition—defendants assert that it was originally an exhibit to the deposition of Major Mason taken on April 25, 2018, which is buttressed by the fact that "Major Mason" is written just above the bates number. In any event, this document was an internal email which, according to Major Mason, would not have been transmitted to the medical department. Schuler denied ever having seen it. (2 Schuler Dep. at 214.) Plaintiffs have provided no evidence that Schuler was aware of, or under any impression that, Cairns may have been suffering from Xanax withdrawal. Plaintiffs again appear to be attempting to blur facts to give the impression of a material factual dispute.

[11] In their opposition brief, plaintiffs merge the *possible* 12:51 p m. medical visit with the documented 1:55 p.m. visit, blaming Schuler for failing to monitor Cairns every ten minutes after the alleged 12:51 visit (as evidenced, according to plaintiffs, by his almost immediate need for a 1:55 visit). (Opp'n at 590.) Even taking as true that the 12:51 visit

5

On November 27, 2014, while he was apparently still in medical lockdown, Cairns had to be moved to another cell because he had "trash[ed] his cell with feces and urine." (Doc. No. 37-4, Jail Incident Report, at 631; Nichols Dep. at 247 (40).) Although Nichols' subsequent narrative supplement relating to the incident states that medical was notified, he does not recall for certain whether anyone from medical actually came to check on Cairns. (Nichols Dep. at 248 (42).) Nor is there anything in the record to suggest that Malvasi was contacted.

On November 28, 2014, at around 0737 hours (7:37 a.m.), Cairns seemed to have "gotten worse" and Kara Lightner was called to check on him. (*Id.* at 248, 249 (41–43, 45); Lightner Dep. at 413-14.) She found Cairns "lying on the floor, shaking." (Lightner Dep. at 414.) Cairns was "not coherent, didn't know where he was at, and couldn't talk." (*Id.* at 416.) She realized Cairns was not stable and needed to be sent to the hospital. (*Id.*) Lightner administered Effexor. (*Id.*) Lightner testified that this was the first time she ever noticed Cairns experiencing a medical problem. (*Id.* at 417.) She also acknowledged that he did not always show up for his medicine during Med Pass. (*Id.*) Lightner was under the impression that he was suffering from withdrawal. (*Id.* at 425.)

Contemporaneously, several attempts were made to reach Malvasi by telephone. As it turned out, he was in a hospital where he could not get cell phone reception. A message was left and Malvasi called back promptly. (Nichols Dep. at 249 (46–47).) Lightner testified that Malvasi called in less than five minutes. (Lightner Dep. at 427.) She informed him that Cairns was

---

occurred, Cairns thereafter returned to his regular housing on the second floor of the jail. He would only have been monitored every ten minutes once he was moved to the medical floor (third floor). This is another example of plaintiffs' attempt to create the impression of a factual dispute regarding the care given by Schuler by blurring these two incidents, assuming they both occurred. In addition, Kara Lightner testified that the ten-minute monitoring on the medical floor was conducted by the officers, who might call medical personnel if needed. (Doc. No. 33, Deposition of Kara Lightner ("Lightner Dep.") at 451-52.)

6

transported to the hospital emergency room. (Malvasi Dep. at 567, 571.) Malvasi apparently had no personal contact with Cairns at any time during Cairns' time at the jail.

## II. DISCUSSION

**A.  Legal Standard**

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . .; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the nonmoving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–44 (6th Cir. 1990), *impliedly overruled on other grounds by Salve Regina Coll. v. Russell*, 499 U.S. 225, 111 S. Ct. 1217, 113 L. Ed. 2d 190 (1991). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [nonmoving party] is entitled to a verdict[.]" *Id*. at 252.

"Once the moving party has presented evidence sufficient to support a motion for summary judgment, the nonmoving party is not entitled to trial merely on the basis of allegations; significant probative evidence must be presented to support the complaint." *Goins v. Clorox Co.*, 926 F.2d 559, 561 (6th Cir. 1991). The party opposing the motion for summary judgment may not rely solely on the pleadings but must present evidence supporting the claims asserted by the party. *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (finding that summary judgment is appropriate whenever the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial). Moreover, conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not sufficient to defeat a well-supported motion for summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). In other words, to defeat summary judgment, the party opposing the motion must present affirmative evidence to support his or her position; a mere "scintilla of evidence" is insufficient. *Bell v. Ohio State Univ.*, 351 F.3d 240, 247 (6th Cir. 2003). Rule 56 further provides that "[t]he court need consider only" the materials cited in the parties' briefs. Fed. R. Civ. P. 56(c)(3); s*ee also Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989) ("The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988))).

Under this standard, the mere existence of some factual dispute will not frustrate an otherwise proper summary judgment motion. *Dunigan v. Noble*, 390 F.3d 486, 491 (6th Cir. 2004) (quotation marks omitted) (citing *Anderson*, 477 U.S. at 247–48). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

**B.     Analysis**

   **1.     Plaintiff Cairns**

In the first claim of his complaint, Cairns alleges, under Section 1983, that defendant Schuler "became aware of facts from which to infer substantial medical risks to Cairns, including the acute drug withdrawal symptoms . . .[,]" but despite "[drawing] that inference, . . .disregarded those risks in deliberate indifference to Cairns' stated medical needs." (Compl. ¶¶ 5–6.)

To prevail on his claim against Schuler under 42 U.S.C. § 1983, Cairns must prove "'(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law.'" *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 736 (6th Cir. 2015) (quoting *Jones v. Muskegon Cty.*, 625 F.3d 935, 941 (6th Cir. 2010)). Defendants have not challenged the second element, nor could they.

The constitutional right at issue here is the Eighth Amendment right to be free from cruel and unusual punishment. The requisite "state of mind is one of deliberate indifference to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Supreme Court has required something more than mere negligence to demonstrate deliberate indifference to serious medical needs. There must be a showing of "the 'unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). "This does not mean "that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle*, 429 U.S. at 104.

It is undisputed that, to establish deliberate indifference, a plaintiff must satisfy both an objective and a subjective component. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). "Satisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013). Even assuming for the sake of argument that the objective component is met here, Cairns fails to satisfy the subjective component.

In *Farmer v. Brennan*, *supra*, the Court held that "a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety[.]" *Farmer*, 511 U.S. at 837. "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

Despite the jumble of facts that plaintiffs have tried to weave together in their opposition brief—attempting to attribute knowledge of all those facts to Schuler (*see* Opp'n at 590–91, 592)—the record shows that Schuler's only contact with Cairns was early in the morning during one eight-hour shift on November 25, 2014, when, at around 8:00 a.m., she provided Cairns with the only prescribed medicine (Effexor) that he had informed the jail about. At that time, Schuler knew, from the medical reports, that Cairns had refused to take that medicine during the preceding days. This was the result of Cairns' own choices. Cairns has not pointed to any case law that would suggest it was Schuler's (or anyone's) affirmative responsibility under the undisputed facts to force Cairns to take the Effexor. Even if there were such a duty, failure to discharge that duty would be no more than negligence, which is not actionable under Section 1983. *See, e.g.*, *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (noting that the Court in *Estelle* rejected "the

constitutionalization of medical malpractice claims"). In addition, on the day she saw Cairns, Schuler had no reason to know of, or suspect withdrawal from, Xanax, since Cairns had not informed medical personnel that he was prescribed, and taking, that medication.

Further, around the time Schuler's shift ended on November 25, 2014 (*i.e.*, 2:00 p.m.), and at about the time Cairns claims he *may* have seen Schuler (*i.e.*, 1:55 p.m.), Cairns was placed on medical lockdown and was thereafter monitored every ten (10) minutes. Despite plaintiffs' attempt to argue that, while Schuler was still on duty, *she* should have been observing him every ten (10) minutes, the record does not support that assertion. In the first place, Cairns was not placed in medical lockdown until 1:55 p.m. and Schuler's shift ended at 2:00 p.m. There is nothing to suggest that she was even involved; in fact, the record shows that Kara Lightner was the medical assistant on duty when the medical lockdown occurred.[12] In addition, during medical lockdown, it was the guards who would do the monitoring, not medical personnel themselves. During that lockdown, the medical staff was not notified of any serious medical issues and, therefore, could not be found to have been deliberately indifferent. And, in any event, Schuler was off-duty during the medical lockdown. On November 28, 2014, when a different medical assistant noted Cairns' deteriorated condition, he was promptly taken to the hospital.

Plaintiffs' argument amounts to little more than their personal belief that Schuler (1) "no doubt observed [Cairns'] drug-withdrawal symptoms[,]" (2) "drew [an] inference [of drug withdrawal]," and (3) chose to "do[] nothing to address the situation." (Opp'n at 592.) In support

---

[12] Plaintiffs originally filed a complaint in another civil action that included Lightner, and others, as defendants. *See* Case No. 4:15-cv-2442, *Cairns v. Trumbull Cty. Comm'rs, et al.* Over time, all but defendants Schuler, Malvasi, and Lightner were voluntarily dismissed. Then, on May 1, 2017, plaintiffs voluntarily dismissed their claims, without prejudice as to Schuler and Malvasi, and with prejudice as to Lightner. When the instant complaint was filed, plaintiffs indicated that it was this earlier case refiled against Schuler and Malvasi. (*See* Doc. No. 1-1, Civil Cover Sheet at 5.)

11

of the first assertion, plaintiffs cite to places in the record where *others* (Cintron, Nichols, and Anders, but not Schuler) observed or commented on Cairns' "extremely strange," "very disoriented," "missing something" demeanor. (*Id*. at 590, 592.) In support of the second assertion, plaintiffs cite to CO Nichols' shift report that Cairns "is coming off Xanax" but they point to nothing whereby this alleged "knowledge" might be imputed to Schuler. (*Id*. at 591, 592.) And to support their third assertion, plaintiffs cite the lack of any "notation of her [Schuler's] observations of [Cairns] in his chart[,]" (*Id*. at 592), as proof that she did nothing. But this assumes that Schuler would have had any observations of "medical issues" that needed to be reported. The record shows that Cairns' "medical issues"—which were caused by his failure to advise that he was prescribed Xanax, exacerbated by his own inexplicable refusal to take his Effexor—developed at a time when Schuler was not on duty and were addressed immediately when they came to light.

Cairns is simply unable to meet his burden to show the subjective element required to make out a claim for deliberate indifference as to defendant Schuler. Therefore, defendants are entitled to summary judgment on the first Section 1983 claim.

In his second claim under Section 1983, Cairns alleges that Malvasi "executed a governmental policy or custom of deliberate indifference to the emergency and other serious medical needs of his jail patients . . . and wholly failed to train and supervise his jail medical staff, including [d]efendant Schuler; or trained and supervised them so recklessly, grossly negligently or deliberately indifferently; and/or failed to hire the staff necessary to address the serious medical needs of the inmate population, such that future medical staff misconduct, including that of [d]efendant Schuler, was near inevitable or substantially certain to occur." (Compl. ¶¶ 2-3.) Cairns alleges that "[a]s a direct and proximate result of [d]efendant Malvasi's stated execution and/or failures," he was injured and suffered losses. (*Id.* ¶ 4.)

12

To prevail on a claim of supervisory liability, Cairns must *first* establish that he suffered a constitutional injury. Failing that, he cannot maintain a derivative action against a supervisor, even if it is possible that the supervisor may have fostered a policy of unconstitutional practices. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual [state actor], the fact that the departmental regulations might have *authorized* the use of [unconstitutional action] is quite beside the point."); *see also McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006) ("[A] prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor.").

Because Cairns has not established a constitutional injury, his claim against Malvasi for supervisory liability must fail.

**2.     Plaintiff Mondary**

Plaintiffs take the position that their complaint states an independent claim for loss of consortium by Mondary. Although not argued by defendants in their motion for summary judgment, the Court doubts that there is such a separate claim. The only mention of Mondary and her purported loss of consortium is in paragraph 9 of the complaint, incorporated into the cause of action captioned "42 USC § 1983 Individual Liability."

"Section 1983 creates a cause of action for deprivation of civil rights." *Jaco v. Bloechle*, 739 F.2d 239, 241 (6th Cir. 1984). By its terms, "the statute grants the cause of action 'to the party injured.'" *Id.* "Accordingly, it is an action *personal* to the injured party." *Id*. (emphasis in original.) "[O]nly the purported victim . . . may prosecute a section 1983 claim; conversely, no cause of action may lie under section 1983 for . . . any other consequent collateral injuries allegedly suffered personally by the victim's family members." *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir.

13

2000);[13] *see also H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 S. Supp. 3d 992, 1016 (S.D. Ohio 2015) (noting that a person "cannot sue for loss of consortium directly under § 1983"). Mondary has no standing to assert loss of consortium under Section 1983.

In any event, given the fact that Cairns' Section 1983 claims do not survive summary judgment, as discussed above, even if the complaint were generously construed to include a separately-pleaded loss of consortium claim (or even if an amendment were sought and permitted—which has not occurred), that claim would also not survive because it would be derivative of the failed constitutional tort claims. *See Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992) ("[A] claim for loss of consortium is derivative in that the claim is dependent upon the defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury.").

To the extent the complaint contains a loss of consortium claim brought by Mondary, it is dismissed.

---

[13] In *Claybrook*, the Court of Appeals reversed the district court's Rule 12(b)(6) determination that two Section 1983 counts of the complaint arguably purporting to raise children's personal claims for injuries arising from a violation of their deceased father's constitutional rights should be dismissed for lack of standing. The Sixth Circuit held that, "[n]otwithstanding that certain allegations of the amended complaint also appear to aver that [decedent's] children suffered personal losses . . . which created some ambiguity regarding the identity of the person(s) whose injuries in fact were asserted in counts one and two," *Claybrook*, 199 F.3d at 357–58, the complaint sufficiently alleged that the children were seeking recovery as representatives of their father's estate. The court of appeals characterized "those extraneous allegations to constitute mere surplusage[.]" *Id*. at 358. Here, the situation is different. Mondary is not the personal representative of any estate; she is, rather, improperly attempting to assert her own injuries within the context of a Section 1983 claim.

## III. CONCLUSION

For the reasons set forth herein, defendants' motion for summary judgment (Doc. No. 28) is **granted** and this case is dismissed.

**IT IS SO ORDERED**.

Dated: January 16, 2019

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**